Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL X

| | | |
|---|---|---|
| SANDRA PAGÁN RIVERA<br><br>Apelante<br><br>V.<br><br>MARÍA VIRGINIA DEL ROSARIO SANTANA<br><br>Apelada | KLAN202300652 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>K PE2016-3394<br><br>Sobre:<br>Desahucio en Precario |

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 31 de enero de 2024.

El 31 de julio de 2023, compareció ante este Tribunal de Apelaciones, la señora Sandra Pagán Rivera (en adelante, la apelante o señora Pagán Rivera), por medio del recurso de epígrafe. Mediante este, nos solicita que revisemos la *Sentencia* emitida el 27 de junio de 2023 y notificada el 28 de junio de 2023, por el Tribunal de Primera Instancia, Sala Superior de San Juan.

En virtud del aludido dictamen, el foro a *quo* declaró Ha Lugar la *Demanda Enmendada* de desahucio instada en contra de la señora María Virginia Del Rosario Santana (en adelante, la apelada o señora Del Rosario Santana), condicionado a que los dueños de la propiedad inmueble en cuestión le pagaran la suma de veintiséis mil dólares ($26,000.00) por concepto de mejoras alegadamente realizadas por esta, así como la suma de cuarenta mil dólares ($40,000.00), por concepto de daños y angustias mentales. En adición, el foro de instancia ordenó el pago de intereses, a razón del cuatro punto veinticinco por ciento (4.25%) anual sobre estas

cantidades, contado a partir de la fecha de presentación de la *Demanda*.

Adelantamos que, por los fundamentos que expondremos a continuación, se modifica en parte la *Sentencia* impugnada y así modificada, se confirma.

**I**

Los eventos fácticos y procesales que dan lugar al recurso que nos ocupa son los que en adelante se esbozan. Cabe mencionar que, el presente caso exhibe un tracto procesal sumamente accidentado y prolongado.[1] No obstante, nos circunscribiremos a reseñar aquellos incidentes pertinentes a la controversia que nos atañe.

El 16 de noviembre de 2016, la apelante instó ante el Tribunal de Primera Instancia, una escueta *Demanda* sobre Desahucio en precario en contra de la señora Del Rosario Santana y otra persona con nombre desconocido (John Doe). Según surge de las alegaciones de la *Demanda*, la señora Pagán Rivera es heredera junto a sus siete (7) hermanos, de una propiedad inmueble sita en la Calle Eleonor Roosevelt, número 305 de la Urbanización Roosevelt en Hato Rey.[2] La misma fue adquirida por herencia de sus fenecidos padres, Jorge Pagán Padovani y Raquel Rivera.

En su *Demanda*, la señora Pagán Rivera alegó que, con anterioridad, el referido inmueble estuvo ocupado por la señora Zoraida Del Rosario, hermana de la apelada. Sobre ello, abundó en que, en un caso distinto[3], el foro primario había dictado sentencia, ordenando el lanzamiento de la señora Zoraida Del Rosario. Alegó que, ante ello, cambió las cerraduras de la propiedad. Sin embargo, indicó que posteriormente, la apelada rompió las mismas e invadió

---

[1] Para una mejor comprensión del caso, el 20 de octubre de 2023, solicitamos en calidad de préstamo, los autos originales del mismo.

[2] Los miembros de la sucesión son: César Augusto Pagán Rivera, Raquel Pagán Rivera, Sandra Idalia Pagán Rivera, Migdalia Pagán Rivera, Ariel Juan Pagán Rivera, Yamil Antonio Pagán González, Zulma Eneida Pagán González y Jorge Arquímides Pagán González.

[3] Identificado con el alfanumérico K PE2014-3587 (602).

el inmueble. A esos efectos, la señora Pagán Rivera solicitó al tribunal de instancia que declarara con lugar la demanda y ordenara el desalojo de la propiedad.

Tras varias incidencias procesales, innecesarias pormenorizar para atender el recurso, la señora Del Rosario Santana contestó la *Demanda*, el 31 de enero de 2017. Simultáneamente, instó una *Reconvención*. En cuanto a la *Demanda*, sostuvo que existía un conflicto de título, relacionado a la posesión del inmueble, y al valor de la reconstrucción y las reparaciones que había llevado a cabo. Añadió que, "la acción correspondiente en el presente caso es el cumplimiento del contrato de opción por parte de la demandante[,] toda vez que[,] la demandada está y ha estado en disposición de adquirir la propiedad conforme el contrato de opción otorgado."[4]

Con respecto a la *Reconvención*, alegó que luego de haber sido notificada por el Departamento de la Vivienda, de que había sido pre cualificada para recibir los beneficios del programa *La Llave para Tu Hogar*, se encontraba en la búsqueda de una propiedad residencial.[5] En consideración a ello, esbozó que fue con la persona para quien trabajaba a preguntar por el inmueble en cuestión, el cual estaba abandonado y en condiciones deplorables. Expresó que, los vecinos le informaron sobre el fallecimiento de las personas que vivían en la propiedad, así como también, que la misma había estado abandonada por cuatro o cinco años, luego de un fuego. Agregó que, estos indicaron donde trabajaba una de las hijas de los fenecidos dueños.

Luego de dos visitas al lugar que le indicaron, la apelada manifestó que logró comunicarse con la señora Migdalia Pagán Rivera, una de las herederas de la propiedad, y le manifestó su

---

[4] Apéndice del recurso de Apelación, pág. 4.
[5] Según los autos, la notificación de pre cualificación fue realizada el 25 de agosto de 2004.

interés por la misma. La señora Migdalia Pagán Rivera le expresó que tendría que consultarlo con sus hermanos. Varias semanas después, la señora Migdalia Pagán Rivera se comunicó con ella, y le indicó que venderían la propiedad, pero que ni ella ni sus hermanos llevarían a cabo las reparaciones. Ante ello, la apelada sostuvo que aceptó hacer las reparaciones, si los hermanos "ajustaban el precio a sus posibilidades"[6], a lo que la señora Migdalia Pagán Rivera consintió.

Así las cosas, la señora Del Rosario Santana esgrimió que, el 7 de abril de 2005, se reunió con las hermanas Migdalia y Raquel, ambas de apellido Pagán Rivera (en adelante, hermanas Pagán Rivera), y llegaron a un acuerdo de compraventa de la propiedad, por la suma de ochenta y cinco mil dólares ($85,000.00).[7] Para formalizar el acuerdo, las hermanas Pagán Rivera y la señora Del Rosario Santana suscribieron un documento titulado *Contrato de Opción*[8] (en adelante, el Contrato). De este surge que, la señora Del Rosario Santana llevaría a cabo las reparaciones para que la propiedad cualificara para el financiamiento, "con la cooperación de la parte vendedora."[9] En adición, surge del Contrato que, al momento de firmar el mismo, la señora Del Rosario Santana debía entregar un cheque por concepto de opción, por la cantidad de $500.00 a las hermanas Pagán Rivera.

La apelada arguyó que, desde dicha fecha, entró en posesión de la propiedad y comenzó a limpiarla y acondicionarla para hacerla habitable. Indicó además, que realizó una solicitud de préstamo hipotecario ante una financiera, a los fines de completar la compraventa de la propiedad. Sin embargo, la señora Del Rosario Santana sostuvo que con posterioridad, específicamente el 6 de

---

[6] Apéndice del recurso de Apelación, pág. 5.
[7] Es menester señalar que, la apelante no estaba presente al momento en que se llegó a dicho acuerdo.
[8] Apéndice del recurso de Apelación, pág. 479.
[9] *Íd.*

octubre de 2005, las hermanas Pagán Rivera y la apelante, se personaron a la residencia en cuestión, y le solicitaron la devolución de las llaves del inmueble, así como que sacara sus pertenencias del mismo, para mostrarlo a otros posibles compradores. La apelada se rehusó.

Finalmente, la señora Del Rosario Santana esgrimió que: (i) las actuaciones negligentes y/o culposas de la apelante habían ocasionado pérdidas y daños estimados en $50,000.00; (ii) los intentos de la apelante para desalojarla ilegalmente ocasionaron daños mentales y morales que ascendían a $100,000.00 y, (iii) la suma de mejoras útiles y reconstrucción de la propiedad se estimaba en $26,000.00.  A esos efectos, solicitó la desestimación de la *Demanda*, y la conversión del pleito al curso ordinario para tramitar la *Reconvención*.

El 2 de febrero de 2017, el foro de instancia dictó *Orden*, disponiendo que el caso seguía el trámite ordinario, y señalando la Conferencia Inicial para el 16 de marzo de 2017.[10] Previo a la celebración de dicha conferencia, el 23 de febrero de 2017, la apelante presentó *Solicitud de Desestimación de Reconvención y Solicitud de Señalamiento de Juicio en su Fondo*. Por medio de esta, sostuvo que las alegaciones incluidas en la *Reconvención* eran en contra de personas que no formaban parte del pleito. Añadió que, la misma era contraria al procedimiento sumario de desahucio, por lo que no procedía.

Atendida la moción, el tribunal primario emitió otra *Orden*, el 28 de febrero de 2017, reiterando que el caso se convirtió al trámite ordinario. Al respecto, ordenó a la apelante que contestara la

---

[10] La Conferencia Inicial fue pospuesta para el 23 de marzo de 2017. Luego, el 2 de agosto de 2017 se celebró una vista de *status*, en la cual se señaló la Conferencia con Antelación al Juicio para el 8 de septiembre de 2017. No obstante, la misma fue pospuesta varias veces, y no fue hasta el 22 de enero de 2018 que se llevó a cabo la misma.

*Reconvención* y a comparecer a la Conferencia Inicial señalada, luego de cumplir con la Regla 37 de Procedimiento Civil.[11]

Luego de otros varios trámites procesales, el 28 de julio de 2017, la señora Pagán Rivera instó *Contestación a Reconvención*. Mediante esta, negó algunas alegaciones y aceptó otras. Como defensas afirmativas, sostuvo que, "[p]ara que un contrato de opción de compra sobre un inmueble [fuese] válido, [tenía] que estar suscrito por todos los dueños del mismo"[12], de modo que, no existía un contrato de opción de compra en el caso. Añadió que, la apelada ocupaba la casa desde el mes de abril de 2005 sin pagar renta. Finalmente, indicó que las mejoras realizadas por la señora Del Rosario Santana no le concedían el derecho a permanecer en la propiedad.

El 11 de septiembre de 2017, la apelada presentó *Solicitud de Desestimación por Falta de Partes Indispensables*. A grandes rasgos, alegó que el Tribunal carecía de jurisdicción, puesto que la apelante no incluyó a los demás herederos en el pleito, y estos eran parte indispensable. El 18 de septiembre de 2017, el foro de instancia concedió 15 días a la señora Pagán Rivera para que fijara su posición en torno a la referida moción. En cumplimiento, el 7 de febrero de 2018, la apelante instó *Réplica a Solicitud de Desestimación por Falta de Partes Indispensables*, donde en esencia, sostuvo que un codueño de un inmueble podía llevar a cabo actos de administración del inmueble, incluyendo una acción de desahucio en precario, sin el consentimiento unánime de los demás codueños.

El tribunal *a quo* atendió los planteamientos durante la continuación de la Conferencia con Antelación al Juicio[13], el 27 de

---

[11] Cabe señalar que, en desacuerdo con la determinación, la apelante compareció ante esta Curia mediante recurso de *certiorari*, identificado con el alfanumérico KLCE201700378. El mismo fue denegado por un Panel Hermano. Luego, la apelante acudió ante el Tribunal Supremo mediante *certiorari*, más dicho foro también declaró No Ha Lugar el recurso.
[12] Apéndice del recurso de Apelación, pág. 33.
[13] Véase, nota al calce número 10.

marzo de 2018. En esencia, determinó que, para propósitos de la *Demanda*, los demás coherederos no eran partes indispensables. No obstante, razonó que sí lo eran para la *Reconvención*. Les indicó a las partes que, la única solución era emplazar a los mismos o, presentar una demanda independiente y que se consolidara el caso. De otro lado, autorizó las enmiendas a la demanda y reconvención respectivamente.

El 12 de abril de 2018, la apelada presentó *Moción en Solicitud de Emplazamiento*, para emplazar a la señora Migdalia Rivera Pagán, y *Moción en Solicitud de Emplazamiento por Edicto*, a los fines de emplazar a los demás herederos de la sucesión.[14] El Tribunal de Primera Instancia dispuso Ha Lugar ambas solicitudes, el 23 de abril de 2018.[15] El mismo día, la Secretaria del Tribunal de Primera Instancia expidió el emplazamiento de la señora Migdalia Rivera Pagán y, al siguiente, expidió los edictos correspondientes.

El 5 de junio de 2018, la señora Pagán Rivera presentó *Demanda Enmendada*, a los únicos fines de incluir una reclamación por concepto de canon de arrendamiento, y la solicitud de la cuantía generada durante el tiempo transcurrido.

En igual fecha, la señora Migdalia Pagán Rivera presentó *Contestación a Reconvención tomada como Demanda Contra Terceros; y Reconvención de Tercero*. En lo pertinente, esta admitió que acordó venderle el inmueble en cuestión a la apelada, por la cantidad de $85,000.00, y que ella se encargaría de las reparaciones. Por otro lado, arguyó que, el cheque de $500.00 por concepto de la opción de compraventa, le fue devuelto por el banco por fondos insuficientes. A esos efectos, sostuvo que fue la apelada quien incumplió con el contrato.

---

[14] En su solicitud, la apelada indicó que, según acordado, las direcciones de los miembros de la sucesión le fueron provistas por la apelante.
[15] El dictamen del Tribunal de Primera Instancia fue notificado al día siguiente, entiéndase, el 24 de abril de 2018.

Como defensas afirmativas, entre otras, arguyó que le comunicó a la apelada que no contaba con la autorización de sus hermanos para la venta de la propiedad, y que "trataría de conseguirla". Indicó además que, el documento suscrito no le otorgaba derecho a título alguno a la señora Del Rosario Santana sobre la propiedad.

En su *Reconvención de Tercero*, la señora Migdalia Pagán Rivera indicó que, la apelada poseía la propiedad sin su consentimiento y sin pagar renta, por lo que solicitó el desahucio y el pago de renta por el tiempo que esta había mantenido la propiedad, suma que ascendía a $78,000.00, así como que se le ordenara el pago de $500.00 mensuales hasta que entregara el inmueble.

El 27 de junio de 2018, la señora Del Rosario Santana presentó *Contestación a Reconvención*, en la que, a grandes rasgos, reprodujo las alegaciones realizadas en su *Contestación a Demanda y Reconvención*, presentada el 31 de enero de 2017.

Tras múltiples incidencias procesales, se celebró el Juicio en su Fondo los días 3 y 4 de febrero de 2020, y 13 y 14 de junio de 2022. Según se desprende del expediente, las partes sometieron en el juicio, como prueba documental estipulada, la siguiente:

a. **Exhibit I** - *Contrato de Opción* suscrito el 7 de abril de 2005.

b. **Exhibit II** - Copia de cheque número 0005 del Banco Popular del 11/5/05 por $500.00 a nombre de Migdalia Pagán Rivera.

c. **Exhibit III** - Procedimiento para someter cheques sin fondo de la fiscalía de San Juan.

d. **Exhibit IV** - Carta de 10 de octubre de 2005 que le envió Migdalia Pagán Rivera a María Del Rosario.

e. **Exhibit V** - Fotos del exterior de la propiedad.

f. **Exhibit VI** - Transcripciones de deposiciones tomadas a María Del Rosario.

g. **Exhibit VII** - Solicitud de Reconvención de María Del Rosario.

Por otro lado, la señora Pagán Rivera no marcó ni presentó prueba documental, mientras que, la apelada presentó la siguiente:

a. **Exhibit I** - Solicitud de Servicio al Departamento de la Vivienda.

b. **Exhibit II** - Carta del 11 de octubre de 2005 de Carmen Selva, Presidenta de The Mortgage Loan Company a María Del Rosario.

c. **Exhibit III** - Carta del 14 de octubre de 2005 de Carmen Selva, Presidenta de The Mortgage Loan Company a María Del Rosario.

d. **Exhibit IV** - Cinco fotografías de la propiedad antes de la remodelación.

e. **Exhibit V** - Facturas de gastos en mejoras consistentes en 24 páginas enumeradas.

f. **Exhibit VI** - Video de remodelación.

En cuanto a la prueba testifical, la apelante no declaró sobre los hechos de la *Demanda*, pero sí sobre las alegaciones de la *Reconvención*[16], mientras que la señora Del Rosario Santana prestó su testimonio.

Escuchada y aquilatada la prueba, el foro primario dictó la *Sentencia* apelada el 27 de junio de 2023, notificada al siguiente día. En su dictamen, el tribunal de instancia vertió las *Estipulaciones de Hechos y Hechos Relevantes* que merecieron su credibilidad durante el juicio y que, en adelante, se esbozan:[17]

1. El inmueble objeto del desahucio en el caso de autos ubica en Calle Eleonor Roosevelt 305, Urb. Roosevelt en Hato Rey.

2. El referido inmueble está inscrito en el Registro de la Propiedad, R[í]o Piedras Norte, Sección Segunda de San Juan, Tomo 391, Folio 37, finca 8370-A desde el 26 de abril de 1954 a nombre de Jorge Pagán Padovani con estatus civil soltero.

---

[16] Conforme surge de la *Sentencia*, tanto la señora Migdalia Pagán Rivera como Joseph Lebrón fueron anunciados como testigos, pero no fueron llamados a testificar en el juicio.

[17] Surge del Informe Enmendado de Conferencia Preliminar entre Abogados que los siguientes hechos fueron estipulados: 1, 2, 3, 4, 15, 16, 17, 26, 27, 31, 32, 40, 41, 42, 43 y 52.

3. Jorge Pagán Padovani fallece el 11 de julio de 1996, viudo, dejando como únicos y universales herederos a los siguientes hijos: 1) César Augusto Pagán Rivera, hijo; 2) Raquel Pagán Rivera, hija; 3) Sandra Idalia Pagán Rivera, hija; 4) Migdalia Pagán Rivera, hija; 5) Ariel Juan Pagán Rivera, hijo; 6) Yamil Antonio Pagán González, hijo; 7) Zulma Eneida Pagán González, hija; y 8) Jorge Arquímides Pagán González, hijo.

4. Estos herederos adquirieron el inmueble por herencia de [su padre].

5. El 25 de agosto de 2004, María [D]el Rosario recibió del Departamento de la Vivienda una carta [de] precalificación en respuesta a su solicitud de Programa de "La llave para tu hogar".

6. A inicios del 2005, Mary González, hoy fallecida, y para quien María [D]el Rosario trabajaba, le acompañó a preguntar por una casa abandonada cercana a la suya en la Urb. Roosevelt, la Calle Eleonor Roosevelt no. 305.

7. Los vecinos de la vivienda, en el no. 303, los esposos Iturrino, hoy fallecidos, le informaron a María [D]el Rosario que los que vivieron en la casa no. 305 habían fallecido y que la casa había estado abandonada cuatro o cinco años a causa de un fuego.

8. María [D]el Rosario suministró 5 fotos mostrando en el estado en el que se encontraba la propiedad.

9. La casa se veía oscura, parcialmente quemada, sin puertas, ventanas laterales, mucha basura amontonada y escombros dentro y fuera.

10. Los vecinos de la vivienda le informaron que en el Hospital Auxilio Mutuo trabajaba una de las hijas de Jorge Pagán Padovani.

11. María [D]el Rosario acudió al Hospital Auxilio Mutuo en dos ocasiones, y, en la segunda, encontró a Migdalia Pagán Rivera y le preguntó por la situación legal del inmueble y si estaba en venta, a lo que esta le contestó que sus padres habían fallecido y que hablaría con sus hermanos.

12. Semanas más tarde, Migdalia Pagán Rivera le informó a María [D]el Rosario, vía llamada telefónica, que venderían la propiedad, pero que no tenían dinero para reparar la casa. A esto, María [D]el Rosario le contestó que tenía una precalificación del Departamento de la Vivienda y que con la ayuda de "La llave para tu hogar", más su salario, podía obtener financiamiento.

13. Migdalia Pagán Rivera le indicó a María [D]el Rosario que ella, y el resto de los miembros de la

sucesión le venderían la propiedad sin reparar. María [D]el Rosario accedió a esto, siempre y cuando se ajustara el precio a sus posibilidades, a lo cual Migdalia Pagán Rivera asintió.

14. El 7 de abril de 2005, Migdalia Pagán Rivera llamó por teléfono a María [D]el Rosario para citarla a la propiedad. María [D]el Rosario llegó allí y vio a Migdalia Pagán Rivera acompañada de otra dama a quien presentó como su hermana Raquel Pagán Rivera. Estas le aseguraron, en nombre del resto de los miembros de la sucesión, que acordaron venderle el inmueble por $85,000.00, siempre y cuando María [D]el Rosario se encargara de las reparaciones. En presencia de María [D]el Rosario, Migdalia Pagán Rivera habló por celular con su otra hermana, Sandra Pagán Rivera, acerca de todo lo que le habían informado. María [D]el Rosario le preguntó a Migdalia Pagán Rivera por los documentos del inmueble y ésta le indicó que estaban en su poder y que los llevaría el día que se efectuara el financiamiento y que tenía solo seis (6) meses para reparar.

15. El 7 de abril de 2005, María V. [D]el Rosario Santana, como parte compradora, Migdalia Pagán Rivera y Raquel Pagán como partes vendedoras, suscribieron un documento titulado *Contrato de Opción,* en el cual la primera parte se comprometió a comprar la residencia y la segunda parte se comprometió a vender la residencia por la cantidad de $85,000.00 con la condición de que la compradora llevara a cabo las reparaciones. No se estableció en el documento [la fecha] de [la] compraventa.

16. Una vez firmado el documento, Migdalia Pagán Rivera le entregó las llaves de la residencia a María V. [D]el Rosario Santana, el mismo 7 de abril de 2005.

17. Aunque el referido documento expresa que Del Rosario Santana le entregó en el acto la suma de $500.00, no fue hasta el 11 de mayo de 2005 que esta entregó a Migdalia Pagán Rivera el cheque 005 del Banco Popular, cuenta núm. 203-149761, por esa cantidad.

18. Las reparaciones necesarias para poder poner la propiedad en condiciones para poder habitarla consistían en: tubería de gas rota y con una parte en la intemperie, sistema sanitario dañado, plomería, sistema eléctrico y alambrado colapsado/quemado, equipo de baño y cocina con sus drenajes, escombros, basura, la seguridad del techo y sellado, puertas con sus marcos y mochetas, ventanas, [z]ócalos, pintura vieja quemada o abollada por la humedad y el "liqueo" del techo, piso de vinil chamuscado igual que la pintura, y madera del zinc con polilla ya que una

gran parte se quemó. El techo con varillas roídas y oxidadas a la vista, en el parte posterior afuera el piso desnivelado y se hacían charcos; el agua traspasaba y caía en el interior, la segunda habitación con fango en el piso con un hoyo que salía hacia el patio; lo que una vez fue la bañera estaba llena de heces fecales secas.

19. La demandada llevó a cabo reparaciones necesarias por la suma probada de **$26,000.00** que consistieron en reconstrucción del sistema de agua potable, sellado de techo, instalación de puertas, reparación de la verja, reparación e instalación de rejas, poda de árboles, remoción de ventanas defectuosas e instalación de ventanas nuevas, lavado de presión a toda la casa, remoción de escombros, remoción de la pintura dañada por fuego y por el transcurso del tiempo, remoción de techos de zinc dañado, reconstrucción y sellado de techo del balcón, pintura del inmueble, instalación de pisos de cerámica, reparación de baño e instalación de aparatos sanitarios y otras mejoras. Estas mejoras, reconstrucciones e instalaciones fueron llevadas a cabo con el consentimiento de las [demandantes] que representaron a la [demandada] que eran dueñas leg[í]timas del inmueble y que poseían los documentos de declaratoria de herederos y el título que les permitía vender la propiedad.

20. El 21 de junio de 2005, una vez instaladas las tuberías, de agua y drenaje, María [D]el Rosario consiguió el contrato de la Autoridad de Acueductos y Alcantarillados.

21. Para el 1 de septiembre de 2005, culminadas las limpiezas, remociones, empotramientos y soterrados de la tubería y alambrado, la Autoridad de Energía Eléctrica, a petición de María [D]el Rosario, instaló el servicio de energía eléctrica.

22. Para esa fecha, rondaba la casa un hombre con mochila que en un atardecer trató de entrar a la fuerza, aprovechando que el balcón estaba abierto. Este dijo ser Cesar A. Pagán Rivera, y expresó que se quedaría allí porque esa era su casa. Un joven que ayudó a María [D]el Rosario a entrar unos materiales a la propiedad evitó que Cesar A. Pagán Rivera entrara.

23. María [D]el Rosario le avisó a Migdalia Pagán Rivera sobre el incidente y esta le aseguró que, si alguno de los miembros de la sucesión cambiaba de opinión, ella honraría el acuerdo y garantizaría la inversión de María [D]el Rosario.

24. El 1 de septiembre de 2005, María [D]el Rosario presentó una Solicitud de Préstamo Hipotecario en The Mortgage Loan Company.

25. El 19 de septiembre de 2005, en una conversación telefónica sostenida entre Carmen Selva, presidenta de The Mortgage Loan Company[,] y Migdalia Pagán, la primera le indicó la lista de documentos que requería la financiera, al ser una propiedad de herencia. En específico, le indicó que necesitaba lo siguiente: Declaratoria de Herederos, Planilla de Caudal Relicto y Cancelación de Gravamen, instancia del Registrador y Minuta de presentación. Además, Escritura de Título de la Propiedad, Certificación de Deuda contributiva del CRIM, Certificación de Valores Contributivos, Número de Catastro y el Contrato de Opción de Compraventa en una misiva para ser firmado por todos los herederos, el 21 de septiembre de 2005.

26. El 6 de octubre de 2005, Migdalia Pagán Rivera, Raquel Pagán Rivera y Sandra Pagán Rivera comparecieron a la residencia, le pidieron las llaves de la casa a la demandada, le pidieron que sacara todas sus cosas para que ellas pudieran mostrar la casa a otros compradores.

27. El cheque, por la cantidad de $500.00, fue devuelto por el banco a Migdalia Pagán Rivera por fondos insuficientes. El 10 de octubre de 2005, después de consultar con la fiscalía de San Juan sobre el procedimiento para someter denuncias por cheques sin fondos, Migdalia Pagán Rivera le envió una comunicación a Del Rosario en un formulario que le proveyó la Unidad de Investigaciones de San Juan, donde le concedió 5 días para el pago del mismo, en cheque certificado, giro, o efectivo.

28. El 11 de octubre de 2005, The Mortgage Loan Company le cursó una comunicación a María [D]el Rosario en la cual se le informó que su solicitud de préstamo hipotecario estaba aprobada en lo relacionado a crédito, pero que no se había podido completar porque no había suministrado la descripción legal del inmueble, ni el número de catastro.

29. El 14 de octubre de 2005, María [D]el Rosario compareció a una citación ante la fiscal Sonia Otero Martínez en el Centro de Denuncias de San Juan, a consecuencia de una querella que presentaron las hermanas Pag[á]n Rivera en su contra, querella #05-01-382-11532, el 10 de octubre de 2005. Ellas argumentaron que una mujer dominicana ocupó su casa sin permiso. La querella fue desestimada.

30. En esa misma fecha, The Mortgage Loan Company le cursó una segunda comunicación a la *(sic)* María [D]el Rosario en la que le notificó que el proceso de financiamiento para la propiedad había sido detenido hasta que se le proveyera la documentación necesaria para completarlo.

31. El 14 de octubre de 2005, las hermanas Migdalia, Raquel, y Sandra Pagán Rivera comparecieron a The Mortgage Loan Company. Sandra Pagán Rivera le indicó a la demandada que le entregara las llaves de la casa porque no podía vender y le presionaron para que firmara un contrato de arrendamiento.

32. María V. [D]el Rosario Santana nunca ha pagado renta alguna a los dueños de la residencia.

33. El 10 de febrero de 2006, Migdalia y Raquel Pagán Rivera iniciaron la primera acción legal de desahucio en contra de María [D]el Rosario por alegada inexistencia de contrato y cobro de dinero.

34. Luego de varios trámites procesales de este caso, en la vista que se celebró el 22 de mayo de 2006, se informó sobre un acuerdo en el cual Sandra Pagán Rivera vendería su parte de la herencia por la novena parte del precio pactado en el Contrato de Opción, pero que los gastos, documentos, escrituras e instancias serían por parte de la compradora. Se comprometió a informar al Tribunal, en un plazo de 45 días, sobre cómo había terminado el proceso.

35. El 25 de septiembre de 2006, el Tribunal concedió un término de 10 días para que las partes expusieran las razones por las que no se debía desestimar el caso.

36. El 19 de octubre de 2006, ante el incumplimiento de Sandra Pagán Rivera, el Tribunal dictó una sentencia en la que desestimó el caso civil núm. K PE2006-0757, al amparo de la Regla 39.2 de Procedimiento Civil de 1979.

37. El 24 de julio de 2009, la Policía de Puerto Rico arrestó a un hombre que abrió el candado del balcón de la propiedad a martillazos y destrozó las cerraduras de la entrada a la sala a tal punto que cerró la puerta y el arco con el restante de metal incrustado en la madera. María [D]el Rosario llamó al cuartel estatal de Hato Rey Oeste, ubicado en la misma calle Eleonor Roosevelt, y el agente Víctor Lequillow #10082, corroboró la querella y, por la descripción que le dio esta, entendió que era José A. Pagán Rivera, querella núm. 2009-1-382-70007.

38. El 25 de julio de 2009, María [D]el Rosario presentó un caso por acecho en contra de José A. Pagán Rivera en la Sala de Investigaciones del Tribunal de San Juan, y la Hon. Gloria Maynard le concedió una orden de acecho, pues el peticionado llevaba dos años siguiéndola, acechándola y amenazándola.

39. Por otra parte, el 5 de octubre de 2009, se vio el caso criminal que inició María [D]el Rosario en contra de José A. Pagán Rivera por los mismos

hechos. María [D]el Rosario aceptó la sugerencia de un acuerdo firmado por José A. Pagán Rivera en dónde este se comprometía a respetar la orden de acecho y a no interferir más con ella, y se le advirtió que, de violar ese acuerdo, sería encarcelado de inmediato.

40. El 20 de noviembre de 2014, Sandra Pagán Rivera demandó a Zoraida [D]el Rosario, hermana [de] María V. [D]el Rosario. Hubo que emplazarla por edicto, caso *Sandra Pagán Rivera v. Zoraida del Rosario,* Núm. K PE2014-3587.

41. La demandada en este caso, María V. [D]el Rosario Santana, compareció a todas las vistas celebradas en el caso de desahucio contra su hermana.

42. Después del juicio en su fondo, el 8 de enero de 2015, la Hon. Linette Rivera Rodríguez dictó sentencia disponiendo el desahucio de Zoraida [D]el Rosario.

43. Después de varios incidentes procesales, el 3 de noviembre de 2015, el alguacil del Tribunal, Jesús M. Álamo, compareció a ejecutar [la] orden de desahucio. Zoraida [D]el Rosario no se encontraba en la residencia. Se sacaron las pertenencias que había en la misma, fuera de la casa. El inmueble fue entregado al depositario Joseph Lebrón quien hizo cambio de cerraduras.

44. Según María [D]el Rosario, el 3 de noviembre de 2015, llegaron a la propiedad un alguacil y, en otro vehículo, Sandra Pagán Rivera y Joseph Lebrón, quien sería el encargado de llevar a cabo el lanzamiento. A preguntas que se le hicieron, María [D]el Rosario se identificó y les mostró las facturas de agua y electricidad con sus respectivos contratos, el Contrato de Opción firmado por Migdalia Pagán Rivera y les indicó que hacía diez años que vivía allí y que no había ningún documento con orden de lanzamiento en su contra en la fecha, día, y hora de los hechos.

45. Al ser abordada sobre Zoraida [D]el Rosario, María [D]el Rosario les indicó que esta era su hermana y que no se encontraba en la casa puesto a que no vivía allí, sino que solo estuvo de visita varios meses en Puerto Rico.

46. Posterior a ello, enviaron a agentes de la Policía de Puerto Rico y se le hizo entrega de un documento del Tribunal de Primera Instancia con la orden de lanzamiento. El agente Ricardo Corchado le indicó a María [D]el Rosario que debía acompañarlo a la fiscalía para que un fiscal determinara si había causa para instar una acción criminal en su contra, puesto que se le culpaba de romper la cerradura que se le había puesto a la propiedad.

47. Luego de consultar el caso con un fiscal, el agente Ricardo Corchado regresó con una citación para el 12 de noviembre de 2015 en el cuartel de Hato Rey Oeste. Luego de que María [D]el Rosario compareciera a esa citación con su representación legal, quien le explicó al agente la razón por la cual esta vivía en la propiedad, el agente decidió citar el caso a la Sala de Investigaciones de San Juan.

48. Luego de varios incidentes procesales, en una vista celebrada el 30 de noviembre de 2015, donde se le acusaba a María [D]el Rosario de allanamiento de morada y daños, al escuchar el testimonio de los testigos, el Tribunal determinó que no había causa probable en ninguno de los cargos.

49. El 5 de abril de 2016, Sandra Pagán Rivera presentó una nueva demanda de desahucio en contra de María [D]el Rosario. En la misma, Sandra Pagán Rivera adujo ser parte de los miembros de la sucesión y alegó que María [D]el Rosario ostentaba la posesión en precario del inmueble que le pertenece a estos, el cual se encuentra en la Urb. Roosevelt, Calle Eleonor Roosevelt No. 305 de Hato Rey, P.R.

50. La vista de ese caso se celebró el 13 de septiembre de 2016, y allí se solicitó la desestimación de la demanda por falta de parte indispensable, ante lo expresado por Sandra Pagán Rivera, de que no tenía ningún poder o autorización de los demás herederos de la sucesión para representarlos en esa vista.

51. El 15 de septiembre de 2016, este Tribunal desestimó esa demanda de desahucio en precario por falta de partes indispensables. El tribunal estimó que los demás miembros de la sucesión eran partes indispensables, máxime cuando existen alegaciones de María [D]el Rosario de que algunos de ellos fueron quienes pusieron a María [D]el Rosario en posesión del inmueble; lo que derrotaría la alegación de precarista.

52. María V. [D]el Rosario ha tenido el control y la posesión del inmueble desde el 7 de abril de 2005 hasta el presente.

Cónsono a lo anterior, el Tribunal de Primera Instancia declaró nulo el Contrato suscrito por las hermanas Pagán Rivera y la señora Del Rosario Santana. Consecuentemente, concluyó que procedía el desahucio. No obstante, dispuso que el mismo estaba sujeto a que los miembros de la sucesión satisficieran a la apelada la suma de

$26,000.00, por concepto de las mejoras que ésta realizó de buena fe en la propiedad.

En adición, el foro de instancia declaró Ha Lugar la *Reconvención*, y concedió a la señora Del Rosario Santana una partida en concepto de daños y angustias mentales, ascendiente a $40,000.00, con intereses acumulados al cuatro y un cuarto por ciento (4.25%) anual, desde la presentación de la *Demanda*. Finalmente, declaró No Ha Lugar la *Demanda Enmendada* de la señora Pagán Rivera, en la que reclamó los cánones de arrendamiento, ello, toda vez que, no se presentó prueba sobre la existencia de un contrato de arrendamiento.

En desacuerdo, el 31 de julio de 2023, la apelante presentó el recurso de apelación que nos ocupa y esgrime los siguientes señalamientos de error:

- Erró el TPI al dictar Sentencia contra todos los dueños de la residencia disponiendo que éstos debían pagar a la demandada $26,000.00 por concepto de gastos en mejoras a la residencia que alegadamente ésta realiz[ó] hace más de 18 años, [sin] los dueños haber sido demandados y sin estar bajo la jurisdicción del Tribunal.

- Erró el TPI al ordenar a todos los dueños de la residencia, el pago en daños y angustias mentales de $40,000.00 sin cumplir con el debido proceso de [l]ey[,] ya que no fueron demandados por hechos alegadamente ocurridos más de 18 años y sin que los hechos alegados generara[n] causa de acción en daños y perjuicios.

- Erró el TPI al determinar que la demandada había invertido $26,000.00 en mejoras a la residencia sin prueba documental que sustente esta determinación ya que la prueba documental presentada fue admitida en evidencia sin ser autenticada, siendo imposible la suma de los recibos de que consta la misma, porque las fotocopias de los recibos están tomadas uno encima de otro siendo imposible identificarlos uno de otro separadamente y la mayoría no se puede determinar ni la cantidad ni la fecha ni por qué concepto fueron pagados.

- Erró el TPI al determinar que la demandada no tiene que pagar renta sobre la residencia que ha ocupado por más de 18 años.

- Erró el TPI e incurrió en abuso de discreción al hacer determinaciones de hechos en la Sentencia sobre las cuales no se presentó prueba testifical ni documental en el juicio y recurrió a transcribir literalmente de las alegaciones de la demandada en la Reconvención convirtiéndolas en determinaciones de hecho suyas en la Sentencia.

- Erró el TPI al [n]o encontrar que la demandada incurrió en temeridad.

- Erró el TPI al disponer que los dueños de la residencia debían pagar el 4.25% de intereses sobre las cantidades de $26,000.00 y $40,000.00 a partir de la presentación de la demanda.

Examinado el recurso, el 10 de agosto de 2023, emitimos *Resolución* interlocutoria mediante la cual, en lo pertinente, concedimos a la apelada hasta el jueves 31 de agosto de 2023 para objetar la Transcripción de la Prueba Oral o informar si estipulaba la misma. Le apercibimos que, transcurrido el término dispuesto, sin que se hubiese objetado la misma, se acogería como estipulada por las partes.

En atención a lo ordenado por este foro, el 18 de agosto de 2023, compareció la señora Del Rosario Santana por conducto de su representación legal y nos manifestó su conformidad con la Transcripción de la Prueba Oral sometida por la apelante. En vista de lo anterior, mediante *Resolución* del 23 de agosto de 2023, acogimos la Transcripción de la Prueba Oral y le concedimos término a la apelada, hasta el 25 de septiembre de 2023, para presentar su alegato en oposición.

Transcurrido el término dispuesto, sin que la señora Del Rosario Santana haya presentado su alegato en oposición, damos el recurso por perfeccionado y procedemos a resolver el mismo sin el beneficio de su comparecencia.

**II**

**A. *Deferencia al Tribunal de Primera Instancia***

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de

gran deferencia por parte de los foros apelativos, puesto que, el juzgador de instancia es quien –de ordinario– se encuentra en mejor posición para aquilatar la prueba testifical. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-771 (2013); *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 289 (2011); *SLG Rivera Carrasquillo v. AAA*, 177 DPR 341, 356 (2009). Bajo este supuesto, los foros de primera instancia tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013).

No obstante, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos no debemos intervenir con las determinaciones ni las adjudicaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016); *Dávila Nieves v. Meléndez Marín*, supra, pág. 753; *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *SLG Rivera Carrasquillo v. AAA*, supra.

Como sabemos, "[l]a tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Sin embargo, no tenemos duda de que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad." *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013). Véase, además, *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020); *Umpierre Matos v. Juelle Abello*, 203 DPR 254, 275 (2019), citando a *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). Es por lo que, nuestra más Alta Curia ha definido la *discreción* como "una

forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera." *Rivera et al. v. Arcos Dorados et al.*, 2023 TSPR 65, 212 DPR ___ (2023); *Pueblo v. Rivera Montalvo*, supra, citando a *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2016); *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435, citando a *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna." *Citibank et al. v. ACBI et al.*, supra, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra; *Hietel v. PRTC*, 182 DPR 451, 459 (2011); *Santa Aponte v. Srio. del Senado*, 105 DPR 750, 770 (1977). Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho." *SLG Zapata-Rivera v. J.F. Montalvo*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997); *Hietel v. PRTC*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, supra.

## B. Emplazamiento

En nuestro ordenamiento jurídico, el emplazamiento es el mecanismo procesal que permite al Tribunal adquirir jurisdicción sobre la persona del demandado, para que este quede obligado por el dictamen que, en su día, emita el foro judicial. *Martajeva v. Ferré Morris*, 210 DPR 612, 620 (2022); *Rivera Torres v. Díaz López*, 207 DPR 636, 646-647 (2021); *Pérez Quiles v. Santiago Cintrón*, 206 DPR 379, 384 (2021). Dicho mecanismo procesal es parte esencial del debido proceso de ley, pues su propósito principal es notificar a la parte demandada que existe una acción judicial en su contra. De esta manera, la parte puede comparecer en el procedimiento, ser oído y presentar prueba a su favor. *Martajeva v. Ferre Morris*, supra;

*Rivera Torres v. Díaz López*, supra, pág. 647; *Pérez Quiles v. Santiago Cintrón*, supra; *Global v. Salaam,* 164 DPR 474, 480 (2005); *Datiz v. Hospital Episcopal,* 163 DPR 10, 15 (2004). Por lo tanto, su adulteración constituye una flagrante violación al trato justo. *Torres Zayas v. Montano Gómez, et als.*, 199 DPR 458, 467 (2017).

Conforme a lo anterior, no es hasta que se diligencia el emplazamiento y se adquiere jurisdicción que la persona puede ser considerada propiamente parte; aunque haya sido nombrada en el epígrafe de la demanda, hasta ese momento sólo es parte nominal. Véanse: *Torres Zayas v. Montano Gómez, et als.*, supra; *Sánchez Rivera v. Malavé Rivera*, 192 DPR 854, 870-871 (2015); *Acosta v. ABC, Inc.*, 142 DPR 927 (1997).

En nuestro ordenamiento jurídico, la figura del emplazamiento está regulada por la Regla 4 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 4. En particular, dicho precepto legal dispone que una parte que interese demandar a otra deberá presentar el formulario de emplazamiento conjuntamente con la demanda para que el Secretario o Secretaria del Tribunal lo expida inmediatamente. Regla 4.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 4.1. Una vez expedido el emplazamiento, la parte que lo solicita cuenta con 120 días para poder diligenciarlo. Lo anterior, a partir del momento en que se presenta la demanda o de la fecha de expedición del emplazamiento por edicto. Regla 4.3(c) de Procedimiento Civil, 32 LPRA Ap. V, R. 4.3(c). En caso de que transcurra el referido término de 120 días y éste no se diligencie, el tribunal deberá dictar sentencia en la que decrete su desestimación y archivo sin perjuicio del caso ante su consideración. *Íd. Torres Zayas v. Montano Gómez, et als.*, supra, págs. 467-468; *Martajeva v. Ferre Morris*, supra, pág. 621.

Nuestras Reglas de Procedimiento Civil establecen dos maneras para diligenciar un emplazamiento: de forma personal o

mediante edicto. *Sánchez Ruiz v. Higuera Pérez,* 203 DPR 982, 987 (2020). El emplazamiento personal es el método idóneo para adquirir jurisdicción. Ahora bien, por excepción y en circunstancias específicas, nuestras Reglas de Procedimiento Civil permiten que se utilice el mecanismo del emplazamiento por edicto. Regla 4.6(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 4.6(a). *Caribbean Orthopedics v. Medshape et al,* 207 DPR 994, 1005 (2021).

En particular, la Regla 4.6 de Procedimiento Civil, 32 LPRA Ap. V, R. 4.6, la cual regula todo lo relacionado al emplazamiento por edictos y su publicación, dispone lo siguiente:

(a) Cuando la persona a ser emplazada esté fuera de Puerto Rico, o que estando en Puerto Rico no pudo ser localizada después de realizadas las diligencias pertinentes, o se oculte para no ser emplazada, o si es una corporación extranjera sin agente residente, y así se compruebe a satisfacción del tribunal mediante declaración jurada que exprese dichas diligencias, y aparezca también de dicha declaración, o de la demanda presentada, que existe una reclamación que justifica la concesión de algún remedio contra la persona que ha de ser emplazada, o que dicha persona es parte apropiada en el pleito, el tribunal podrá dictar una orden para disponer que el emplazamiento se haga por un edicto. No se requerirá un diligenciamiento negativo como condición para dictar la orden que disponga que el emplazamiento se haga por edicto.

La orden dispondrá que la publicación se haga una sola vez en un periódico de circulación general de la Isla de Puerto Rico. La orden dispondrá, además, que dentro de los diez (10) días siguientes a la publicación del edicto se le dirija a la parte demandada una copia del emplazamiento y de la demanda presentada, por correo certificado con acuse de recibo o cualquier otra forma de servicio de entrega de correspondencia con acuse de recibo, siempre y cuando dicha entidad no posea vínculo alguno con la parte demandante y no tenga interés en el pleito, al lugar de su última dirección física o postal conocida, a no ser que se justifique mediante una declaración jurada que a pesar de los esfuerzos razonables realizados, dirigidos a encontrar una dirección física o postal de la parte demandada, con expresión de éstos, no ha sido posible localizar dirección alguna de la parte demandada, en cuyo caso el tribunal excusará el cumplimiento de esta disposición.

(b) El contenido del edicto tendrá la información siguiente:

(1) Título — Emplazamiento por Edicto
(2) Sala del Tribunal de Primera Instancia

(3) Número del caso
(4) Nombre de la parte demandante
(5) Nombre de la parte demandada a emplazarse
(6) Naturaleza del pleito
(7) Nombre, dirección y número de teléfono del abogado o abogada de la parte demandante
(8) Nombre de la persona que expidió el edicto
(9) Fecha de expedición
(10) Término dentro del cual la persona así emplazada deberá contestar la demanda, según se dispone en la Regla 10.1 de este apéndice, y la advertencia a los efectos de que si no contesta la demanda presentando el original de la contestación ante el tribunal correspondiente, con copia a la parte demandante, se le anotará la rebeldía y se dictará sentencia para conceder el remedio solicitado sin más citarle ni oírle. El edicto identificará con letra negrilla tamaño diez (10) puntos toda primera mención de persona natural o jurídica que se mencione en éste.

Si la demanda es enmendada en cualquier fecha anterior a la de la comparecencia de la parte demandada que haya sido emplazada por edictos, dicha demanda enmendada deberá serle notificada en la forma dispuesta por la regla de emplazamiento aplicable al caso.

(c) Cuando se trate de partes demandadas desconocidas su emplazamiento se hará por edictos en conformidad con lo dispuesto en esta regla, dándose cumplimiento sustancial a dichas disposiciones en todo lo posible.

Nuestra última instancia judicial ha expresado que los requisitos que dispone la regla de emplazamiento son de estricto cumplimiento. Véanse: *Rivera Torres v. Díaz López,* supra; *Quiñones Román v. Cía. ABC,* 152 DPR 367, 374–375 (2000); *First Bank of P.R. v. Inmob. Nac., Inc.,* 144 DPR 901 (1998); *Rodríguez v. Nasrallah,* 118 DPR 93 (1986). Ello, pues, "el emplazamiento es un trámite medular para el cumplimiento con el debido procedimiento de ley de un demandado y afecta directamente la jurisdicción del tribunal". *Rivera v. Jaume,* 157 DPR 562, 579 (2002); *Torres Zayas v. Montano Gómez, et als.,* supra, pág. 468.

Cónsono a ello, debemos recordar que las normas sobre el emplazamiento "son de carácter impositivo, de las cuales no se puede dispensar. La razón de esta rigurosidad es que el

emplazamiento se mueve dentro del campo del Derecho constitucional y más específicamente dentro del derecho del demandado a ser oído y notificado de cualquier reclamación en su contra". R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Ed. LexisNexis, 2017, pág. 257; *Torres Zayas v. Montano Gómez, et als.*, supra.

En ese sentido, es menester señalar que la falta de un correcto emplazamiento a la parte contra la cual un Tribunal dicta sentencia, "produce la nulidad de la sentencia dictada por falta de jurisdicción sobre el demandado [...]". *Lonzo Llanos v. Banco de la Vivienda*, 133 DPR 509, 512 (1993). Véase también, *Reyes v. Oriental Fed. Savs. Bank*, 133 DPR 15, 21-22 (1993); *Rivera Torres v. Díaz López*, supra, págs. 647-648. Dicho de otro modo, "[t]oda sentencia dictada contra un demandado que no ha sido emplazado o notificado conforme a derecho es inválida y no puede ser ejecutada. Se trata de un caso de nulidad radical por imperativo constitucional". (Citas omitidas). *Torres Zayas v. Montano Gómez, et als.,* supra, págs. 468-469.

## C. *Responsabilidad Civil Extracontractual*

Como sabemos, en nuestro ordenamiento jurídico, la responsabilidad civil extracontractual emana del Artículo 1802 del Código Civil -aplicable al caso de autos- que, a tales efectos, dispone que "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". 31 LPRA ant. sec. 5141.[18] *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, 2023 TSPR 108, 212 DPR ___ (2023); *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 483 (2022); *Colón Santos v. Coop. Seg. Mult. P.R.* 173 DPR 170,177 (2008). Para que prospere una reclamación por daños y perjuicios al amparo del referido precepto legal, se requiere

---

[18] El derecho aplicable en el caso de epígrafe se remite al Código Civil de Puerto Rico de 1930, puesto que, la presentación de la *Demanda* y los hechos que dan base a esta tuvieron lugar antes de la aprobación del nuevo Código Civil de Puerto Rico, Ley 55-2020, según enmendado.

la concurrencia de tres elementos, los cuales tienen que ser probados por la parte demandante: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra; *Cruz Flores v. Hosp. Ryder et al*, supra; *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

El daño constituye el menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra persona. En nuestro ordenamiento jurídico se reconoce la existencia de dos tipos de daños: los especiales, conocidos como daños físicos, patrimoniales, pecuniarios o económicos, y los generales, conocidos como daños morales. *Nieves Díaz v. González Massas*, supra.

La culpa o negligencia es falta del debido cuidado, esto es, no anticipar ni prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en tales circunstancias. *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra; *Montalvo v. Cruz*, 144 DPR 748, 755 (1998).

Cónsono con lo anterior, a través de la jurisprudencia observamos que un elemento esencial de la responsabilidad civil extracontractual es el factor de la previsibilidad. El deber de previsión no se extiende a todo riesgo posible, pues, es necesario examinar si un daño pudo ser el resultado natural y probable de un acto negligente. *Cruz Flores v. Hosp. Ryder et al*, supra. Para determinar si el resultado era razonablemente previsible, es preciso acudir a la figura del hombre prudente y razonable, también conocida como el buen padre de familia, que es aquella persona que actúa con el grado de cuidado, diligencia, vigilancia y precaución que exigen las circunstancias. *Nieves Díaz v. González Massas*,

supra, pág. 844. Si el daño es previsible por éste, hay responsabilidad; sino es previsible, estamos generalmente en presencia de un caso fortuito. *Montalvo v. Cruz*, supra, pág. 756.

El deber de cuidado incluye, tanto la obligación de anticipar, como la de evitar la ocurrencia de daños, cuya probabilidad es razonablemente previsible. El deber de anticipar y prever los daños no se extiende a todo riesgo posible. *Íd.* Lo esencial en estos casos es que se tenga el deber de prever en forma general consecuencias de determinada clase. Sobre este particular, el Tribunal Supremo de Puerto Rico, ha sido enfático al expresar que sin la existencia de este "deber de cuidado mayor" no puede responsabilizarse a una persona porque no haya realizado el acto de que se trate. *Hernández v. Televicentro*, 168 DPR 803, 813-814 (2006).

Ahora bien, el elemento de la previsibilidad se halla íntimamente relacionado al segundo requisito: el nexo causal. En Puerto Rico rige la teoría de la causalidad adecuada, la cual postula que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Cruz Flores v. Hosp. Ryder et al*, supra. En *Rivera v. S.L.G. Díaz*, 165 DPR 408, 422 (2005), nuestro más Alto Foro señaló que la relación causal, elemento imprescindible en una reclamación en daños y perjuicios, es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico. *Nieves Díaz v. González Massas,* supra*,* págs. 844-845. Conforme con lo anterior, un daño podrá ser considerado como el resultado probable y natural de un acto u omisión negligente si luego del suceso, mirándolo retroactivamente, éste parece ser la consecuencia razonable y común de la acción u omisión de que se trate. *Hernández v. Televicentro*, supra, pág. 814; *Cruz Flores v. Hosp. Ryder et al*, supra.

Para establecer la relación causal necesaria, no es suficiente que un hecho aparente ser condición de un evento, si éste regularmente no trae aparejado ese resultado. Esta normativa ha sido fundamentalmente desarrollada con el propósito de limitar la responsabilidad civil a aquellos casos en que la ocurrencia de un hecho dañoso sea imputable moralmente a su alegado autor, porque éste era una consecuencia previsible o voluntaria del acto negligente. *Soto Cabral v. E.L.A.*, 138 DPR 298, 317 (1995).

Al aplicar el principio de la causalidad adecuada, el Tribunal Supremo de Puerto Rico expresó lo siguiente:

> La difícil determinación de cuándo existe nexo causal entre el daño producido por un acto delictivo de un tercero y la omisión de cumplir con la obligación de tomar precauciones, medidas de seguridad y protección, no puede 'resolverse nunca de una manera plenamente satisfactoria mediante reglas abstractas, sino que en los casos de duda ha de resolverse por el juez según su libre convicción, ponderando todas las circunstancias'." *J.A.D.M. v. Centro Comercial de Plaza Carolina*, 132 DPR 785, 796 (1993).

### D. *Valorización de los daños y revisión de las cuantías otorgadas*

La estimación de los daños es una difícil tarea que descansa en la sana discreción del juzgador que ha recibido prueba detallada sobre los daños alegados, guiado por su sentido de justicia, ante todo, porque son ellos quienes tienen un vínculo más cercano con la prueba testifical y todos los componentes que lo rodean. *Cruz Flores v. Hosp. Ryder et al*, supra; *Rodríguez et al. v. Hospital et al.*, supra, pág. 929. Se trata de una labor compleja porque no existe un mecanismo matemático que permita, de forma certera y uniforme valorar los daños exactos que recibe una persona. *Rodríguez Cancel v. AEE*, 116 DPR 443, 451 (1985). Por tanto, la valoración de los daños siempre estará sujeta a cierto grado de especulación. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 509, (2009).

La jurisprudencia ha buscado dar uniformidad y cerrar espacio para la arbitrariedad, utilizando comparativos al momento de establecer la compensación de los daños de una parte. Al revisar una sentencia del Tribunal de Primera Instancia que concedió daños, los foros apelativos deben considerar la prueba desfilada y concesiones otorgadas en casos similares resueltos anteriormente. A pesar de que reconocemos que cada caso es distinto y tiene circunstancias particulares, los precedentes son referencia útil para la determinación de si la compensación es exageradamente alta o ridículamente baja. *Rodríguez, et als. v. Hosp., et als.*, 186 DPR 889 (2012). Es por ello que los tribunales, haremos el ejercicio de mirar aquellos otros casos donde se han probado daños similares para asimismo conceder compensaciones similares. *Escobar Galarza v. Banuchi Pons*, 114 DPR 138, 148 (1983).

Sobre ello, nuestro más Alto Foro ha advertido recientemente que en el proceso de valorización de daños, los tribunales no solo deben examinar la prueba desfilada ante ellos, sino que también deben evaluar las indemnizaciones concedidas en casos anteriores, puesto que estas constituyen "un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario." *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra, citando a *Santiago Montañez v. Fresenius Medical*, supra, pág. 491.

En adición, el Tribunal Supremo ha señalado que el tribunal sentenciador debe seguir dos pasos. En primer lugar, le corresponde detallar en sus dictámenes los casos que utilizó como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra*; Santiago Montañez v. Fresenius Medical*, supra, pág. 493. Dicho de otro modo, el Tribunal de Primera Instancia debe exponer de forma específica los casos similares que utilizó como referencia y el cómputo

realizado para ajustar las cuantías concedidas en casos similares al valor presente. *Santiago Montañez v. Fresenius Medical*, supra. En segundo lugar, el juzgador de hechos deberá tomar en consideración las circunstancias particulares del caso ante su consideración, y no descansar meramente en un cálculo matemático. *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra; *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 DPR 774, 786 (2010).

Por otro lado, es norma reiterada que los tribunales apelativos no deben intervenir con las determinaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra; *Dávila Nieves v. Meléndez Marín*, supra, pág. 771. En los casos de daños y perjuicios, específicamente, se ha reconocido que la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa porque no existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden completamente complacidas. *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, supra, pág. 784.

Es por lo que, los tribunales apelativos guardarán deferencia a las valorizaciones de daños que hagan los foros de primera instancia, porque son éstos los que tienen contacto directo con la prueba testifical y quedan en mejor posición para emitir un juicio. *Rodríguez, et als. v. Hosp., et als.*, supra; *Herrera, Rivera v. S.L.G. Ramírez-Vincéns*, supra, pág. 785.

No obstante, no intervendremos con las estimaciones de daños que los tribunales de instancia realicen, salvo cuando la cuantía concedida advenga ridículamente baja o exageradamente alta. La valoración de los daños está sujeta a un cierto grado de especulación y conlleva elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos. *Íd*; *Cruz Flores v. Hosp. Ryder et al*, supra.

### E. Temeridad y Honorarios

La Regla 44.1(d) de Procedimiento Civil, 32 LPRA Ap. V, R. 41.1(d), establece que en la eventualidad de que una parte haya procedido con temeridad o frivolidad durante el trámite judicial, el tribunal sentenciador deberá imponerle el pago de una suma por honorarios de abogado que el juzgador entienda correspondan a tal conducta. *Andamios de P.R. v. Newport Bonding*, 179 DPR 503, 519-520 (2010); *Meléndez Vega v. El Vocero de PR*, supra, pág. 211.

Por lo tanto, si en la discreción del tribunal de instancia se determina que hubo temeridad de acuerdo con la Regla 44.1(d) de Procedimiento Civil, *supra*, es mandatorio imponer honorarios. *Pérez Rodríguez v. López Rodríguez et al.*, 210 DPR 163, 192-193 (2022); *Montalvo v. Gobernador ELA*, 194 DPR 760, 779 (2016); *Meléndez Vega v. El Vocero de PR*, supra; *P.R. Oil v. Dayco*, 164 DPR 486, 511 (2005). Sólo se intervendrá con dicha determinación si media un claro abuso de esa discreción. *Pérez Rodríguez v. López Rodríguez et al.*, supra, pág. 193; *Andamios de P.R. v. Newport Bonding*, supra, pág. 520; *S.L.G. Flores-Jiménez v. Colberg*, 173 DPR 843, 866 (2008); *P.R. Oil v. Dayco*, supra; *Meléndez Vega v. El Vocero de PR*, supra.

Para cuantificar los honorarios que deben imponerse, la Regla 44.1(d) de Procedimiento Civil, supra, exige la imposición de una suma de dinero, como sanción, por concepto de honorarios a la parte temeraria, que corresponde a dicha conducta observada, "esto es, al grado o intensidad, de tal conducta." *Meléndez Vega v. El Vocero de PR*, supra, págs. 211-212; *Corpak, Art Printing v. Ramallo Brothers*, 125 DPR 724, 738 (1990).

Nuestra Máxima Curia ha expresado que el concepto de temeridad es amplio. *Meléndez Vega v. El Vocero de PR*, supra, pág. 212; *Blás v. Hosp. Guadalupe*, 146 DPR 267, 334-335 (1998). La conducta temeraria se ha descrito como aquella que alarga

innecesariamente un pleito, o que obliga a la otra parte a incurrir en gastos innecesarios o gestiones evitables. *Pérez Rodríguez v. López Rodríguez et al.*, supra; *Nieves Huertas et al. v. ELA I,* 189 DPR 611, 624 (2013); *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 504 (2010), citando a *Elba A.B.M. v. U.P.R.*, 125 DPR 294, 329 (1990). Se ha indicado además, que la temeridad supone "una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia". *P.R. Oil v. Dayco*, supra, págs. 510-511. Véase, además, *S.L.G. Flores-Jiménez v. Colberg,* supra; *Domínguez v. GA Life*, 157 DPR 690, 706 (2002); *Blás v. Hosp. Guadalupe*, supra, págs. 334-337; *Meléndez Vega v. El Vocero de PR*, supra.

La Regla 44.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 44.3, "regula lo concerniente a la fijación del interés legal tanto post sentencia como por temeridad". *Malavé v. Oriental*, 167 DPR 594, 608 (2006); *Gutiérrez v. A.A.A.*, 167 DPR 130, 136 (2006).

El interés post sentencia se refiere al tipo de interés que se impone a favor de la parte victoriosa en todas las sentencias que ordenen el pago de dinero. Éste se computa sobre la cuantía de la sentencia, incluyendo las costas y los honorarios de abogados, y se fija desde la fecha en que se dicte la sentencia hasta que ésta se satisface. *Gutiérrez v. A.A.A.,* supra; *Zequeira v. C.R.U.V.*, 95 DPR 738, 741 (1968). Su imposición es mandatoria a toda parte perdidosa sin distinción alguna. *Malavé v. Oriental*, supra; *Gutiérrez v. A.A.A.*, supra, pág. 137; *Municipio de Mayagüez v. Rivera*, 113 DPR 467, 470 (1982); *P.R. Ame. Ins. Co. v. Tribunal Superior*, 84 DPR 621, 622-623 (1962).

Por otro lado, el interés por temeridad se impone cuando concurren dos requisitos, a saber: (1) que la parte haya procedido temerariamente; (2) que se trate de un caso sobre cobro de dinero o daños y perjuicios. *Gutiérrez v. A.A.A.,* supra; *Lameiro v. Dávila,* 103

DPR 834, 841 (1975). El interés por temeridad se fija sobre la suma principal de la sentencia, sin incluir las costas ni los honorarios de abogados. El cálculo del dicho interés se realiza dependiendo de la reclamación de que se trate. Así pues, en los casos de cobro de dinero, el interés legal se computa desde que surge la causa de acción; mientras, en los casos de daños y perjuicios, el cómputo se realiza a partir de la presentación de la demanda. *Gutiérrez v. A.A.A.*, supra.

Esbozada la norma jurídica, procedemos a aplicarla al caso ante nuestra consideración.

**III**

En su *primer señalamiento de error*, la apelante nos plantea que erró el Tribunal de Primera Instancia al dictar sentencia contra todos los dueños de la residencia, disponiendo que debían pagar a la apelada la cantidad de $26,000.00 por concepto de gastos en mejoras que alegadamente realizó la señora Del Rosario Santana hace más de 18 años, sin que los dueños hubieran sido demandados, y sin estar bajo la jurisdicción del Tribunal.

Por tratarse de una cuestión de umbral, nos corresponde determinar, en primera instancia si, el foro *a quo* adquirió jurisdicción sobre todos los miembros de la sucesión. De entrada, es preciso señalar que, la apelante no incluyó como parte de los anejos al recurso de Apelación, documentos necesarios para dirimir las controversias que se traen ante nuestra atención. No obstante, de una revisión de los autos originales del caso, pudimos constatar que, en efecto, obra en autos la evidencia que acredita que los miembros de la sucesión fueron emplazados. En particular, el 12 de abril de 2018, la apelada instó ante el foro primario *Moción en Solicitud de Emplazamiento*, para emplazar a la señora Migdalia Rivera Pagán, y *Moción en Solicitud de Emplazamiento por Edicto,* con el propósito de emplazar a César Augusto, Raquel, Sandra Idalia,

Migdalia, Ariel Juan, todos los anteriores de apellidos Pagán Rivera, así como a Yamil Antonio, Zulma Eneida y Jorge Arquímides, estos últimos tres, de apellidos Pagán González. En la aludida moción, se incluyeron las direcciones de los miembros de la sucesión, según fueron informadas por la representación legal de la apelante.

En atención a lo solicitado, el 23 de abril de 2018, el foro primario ordenó el emplazamiento de la señora Migdalia Pagán Rivera, y al próximo día, expidió los edictos correspondientes. El edicto en cuestión fue publicado el 4 de mayo de 2018.

Subsiguientemente, a solicitud de la parte apelada[19], el 21 de junio de 2018, notificada al próximo día, el foro *a quo* anotó la rebeldía a los miembros de la sucesión, con excepción de la señora Migdalia Pagán Rivera, quien el 5 de junio de 2018, interpuso *Contestación a Reconvención Tomada como Demanda contra Terceros; y Reconvención de Terceros.*

De las incidencias procesales antes reseñadas, colegimos que el foro primario adquirió jurisdicción sobre los miembros de la sucesión. Como es sabido, las Reglas de Procedimiento Civil permiten a manera de excepción el emplazamiento mediante edictos.[20] Para que el mismo sea válido, la parte que se apresta a llevar a cabo el mismo, debe cumplir estrictamente con los requisitos que exige la Regla 4.6 de las de Procedimiento Civil[21]. De un examen del edicto publicado el 4 de mayo de 2018, observamos que el mismo cumplió con todas y cada una de las formalidades requeridas por la referida regla. Así pues, no le asiste la razón a la apelante al señalar que el Tribunal emitió su dictamen sin haber adquirido jurisdicción sobre los terceros demandados, toda vez que, los emplazamientos

---

[19] El 12 de junio de 2018, la apelada presentó *Solicitud de Anotación de Rebeldía y Vista en Rebeldía.* Cabe señalar que, el tribunal *a quo* dispuso No Ha Lugar a la solicitud de vista en rebeldía.
[20] *Caribbean Orthopedics v. Medshape et al,* supra.
[21] 32 LPRA Ap. V, R. 4.6.

fueron realizados conforme a derecho. En consecuencia, razonamos que el primer señalamiento de error no se cometió.

En su *segundo señalamiento de error,* la señora Pagán Rivera sostiene que el foro *a quo* incidió al ordenar a todos los dueños de la residencia el pago en daños y angustias mentales de $40,000.00, sin cumplir con el debido proceso de ley, ya que no fueron demandados por hechos alegadamente ocurridos más de 18 años atrás, y sin que los hechos alegados generaran causa de acción en daños y perjuicios. En esencia, arguye que las alegaciones de daños y perjuicios presentadas por la apelada no generan una acción a su favor.

En nuestro ordenamiento jurídico, se ha reconocido que la estimación de los daños es una difícil tarea que descansa en la sana discreción del juzgador.[22] No obstante, en la búsqueda de uniformidad, nuestro Alto Foro ha advertido que, en el proceso de valorización de daños, los tribunales deben examinar tanto la prueba desfilada ante ellos, como también las indemnizaciones concedidas en casos anteriores, toda vez que, las mismas actúan como punto de partida y de referencia.[23] A su vez, el tribunal sentenciador viene obligado a detallar en sus dictámenes, en forma específica, los casos que utilizó como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan.[24]

Evaluada la *Sentencia* apelada, observamos que el Tribunal de Primera Instancia no cumplió con el estándar anterior. El foro primario no fundamentó las razones por las cuales procedía una causa de acción en daños ni explicó su raciocinio respecto a las cuantías adjudicadas a la apelada por concepto de daños. Tampoco

---

[22] *Cruz Flores v. Hosp. Ryder et al*, supra; *Rodríguez et al. v. Hospital et al.,* supra.
[23] *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra, citando a *Santiago Montañez v. Fresenius Medical,* supra, pág. 491.
[24] *Sucn. Mena Pamias et. al. v. Meléndez et. al.,* supra*; Santiago Montañez v. Fresenius Medical,* supra, pág. 493.

mencionó cuáles fueron los casos de referencia utilizados para llegar a dicha cuantía. Ello, en clara contravención a lo expuesto en el párrafo que antecede. De manera que, discrepamos de la apreciación de la juzgadora de instancia en cuanto a este asunto. **Ante lo anterior, corresponde declarar No Ha Lugar la *Reconvención* presentada por la apelada, y en consecuencia, eliminar la partida que le fue concedida, en concepto de daños y angustias mentales de cuarenta mil dólares ($40,000.00)**.

Por estar intrínsicamente relacionados los señalamientos de error tercero y quinto, procederemos a discutirlos de forma conjunta.

En su *tercer señalamiento de error*, la apelante sostiene que erró el foro primario al determinar que la demandada había invertido $26,000.00 en mejoras a la residencia, sin prueba documental que sustente dicha determinación, puesto que la prueba documental presentada fue admitida en evidencia sin ser autenticada, siendo imposible la suma de los recibos, puesto que los mismos están unos encima de otros, lo que hace imposible identificarlos separadamente. Añade que, en la mayoría, no se puede determinar cantidad, fecha ni el concepto en que fueron pagados.

Como *quinto señalamiento de error*, la apelante esgrime que el Tribunal de Primera Instancia erró e incurrió en abuso de discreción al hacer determinaciones de hechos en la *Sentencia*, sobre las cuales no se presentó prueba testifical ni documental en el juicio, y recurrió a transcribir literalmente de las alegaciones de la demandada en la reconvención, convirtiéndolas en determinaciones de hecho suyas en la *Sentencia*.

En su **determinación de hecho número 19**, el foro primario consignó lo siguiente:

19. La demandada llevó a cabo reparaciones necesarias por la suma probada de **$26,000.00** que consistieron en reconstrucción del sistema de

> agua potable, sellado de techo, instalación de puertas, reparación de la verja, reparación e instalación de rejas, poda de árboles, remoción de ventanas defectuosas e instalación de ventanas nuevas, lavado de presión a toda la casa, remoción de escombros, remoción de la pintura dañada por fuego y por el transcurso del tiempo, remoción de techos de zinc dañado, reconstrucción y sellado de techo del balcón, pintura del inmueble, instalación de pisos de cerámica, reparación de baño e instalación de aparatos sanitarios y otras mejoras. Estas mejoras, reconstrucciones e instalaciones fueron llevadas a cabo con el consentimiento de las [demandantes] que representaron a la [demandada] que eran dueñas leg[í]timas del inmueble y que poseían los documentos de declaratoria de herederos y el título que les permitía vender la propiedad.[25] (Énfasis en el original).

Empero, si bien es cierto que del testimonio de la señora Del Rosario Santana surge que, la propiedad inmueble no estaba en condiciones para ser habitada, y que esta le hizo sendas reparaciones, la misma no explicó con suficiente especificidad en qué consistieron dichas reparaciones, ni desglosó el costo total de las mismas, con identificación de cada una de las partidas. La apelada se limitó a someter una serie de recibos sin autenticar, los cuales, a juicio nuestro, no tienen suficientes garantías de confiabilidad.

Sin embargo, no surge de la prueba desfilada que la apelante haya objetado oportuna y adecuadamente dicha prueba, por lo cual, optamos por admitir los mismos. Ahora bien, aun dando por buenos dichos recibos, los mismos, en modo alguno, totalizan la suma de veintiséis mil dólares ($26,000.00), adjudicada por el foro primario. De una revisión detallada y ponderada de los recibos en cuestión, nos da un total de **mil seiscientos cincuenta dólares ($1,650.00)**. No nos explicamos cuál fue el cómputo ni el raciocinio de la juzgadora de instancia para totalizar la suma de veintiséis mil dólares ($26,000.00). Tampoco nos lo ha explicado la apelada, toda

---

[25] Apéndice del recurso de apelación, pág. 531.

vez que, no compareció a oponerse al recurso de marras. En vista de lo anterior, coincidimos con la señora Pagán Rivera en que incidió el foro primario al concederle a la apelada la suma de veintiséis mil dólares ($26,000.00) por las mejoras realizadas. Empero, razonamos acertada una partida de $1,400.00 a favor de la apelada, por los alegados esfuerzos realizados. De modo que, **modificamos la cifra otorgada por el foro primario, a los fines de atemperarla a los recibos y a la cuantía por los esfuerzos de la apelada, para un total de tres mil cincuenta dólares ($3,050.00)**.

En su *cuarto señalamiento de error*, la señora Pagán Rivera alega que el tribunal *a quo* incidió, al determinar que la apelada no viene obligada a pagar un canon de arrendamiento sobre la residencia en cuestión, la cual ha ocupado por más de dieciocho (18) años. No nos persuade.

Al igual que concluyó el foro de instancia, de la evidencia presentada por las partes no surge la existencia de un contrato de arrendamiento entre estas.[26] Tampoco surge que la señora Del Rosario Santana haya pactado arrendamiento alguno con cualquier otro miembro de la sucesión. Como bien quedó establecido, la apelada comenzó a ocupar el inmueble de conformidad con el Contrato suscrito, de buena fe, entre ella y las hermanas Pagán Rivera. De modo que, es forzoso concluir que no existe un contrato de arrendamiento entre las partes, por lo que la señora Del Rosario Santana no viene obligada a pagar canon de arrendamiento por el tiempo que estuvo ocupando la propiedad. Razonamos que el cuarto señalamiento de error no se cometió.

Como *sexto error*, la apelante señala que el foro primario erró al no encontrar que la apelada incurrió en temeridad. La temeridad

---

[26] Si bien es cierto que la Tercera Cláusula del aludido contrato expresa: "El término de este arrendamiento será de seis meses a partir de obtenerse los documentos de la declaratoria de herederos", la realidad es que no se pactó un canon mensual. Añadimos que dicho contrato fue declarado nulo mediante la Sentencia impugnada.

se ha descrito como aquella conducta que alarga innecesariamente un pleito, o que obliga a la otra parte a incurrir en gastos innecesarios o gestiones evitables.[27] Al analizar tanto los autos originales como el expediente ante nos, entendemos que la señora Del Rosario Santana no fue temeraria en la tramitación del presente pleito. Tal determinación fue realizada bajo la sana discreción del Tribunal de Instancia, y no observamos que dicho foro haya abusado de la misma. Razonamos que el sexto señalamiento de error no se cometió.

En vista de lo hasta aquí resuelto, se hace innecesaria la discusión del *séptimo señalamiento de error*.

**IV**

Por los fundamentos expuestos, se modifica la *Sentencia* apelada, a los fines de: (i) reducir la cuantía concedida por el Tribunal de Primera Instancia en concepto de mejoras, de $26,000.00 a $3,050.00; y, (ii) declarar No Ha Lugar la *Reconvención* presentada por la señora Del Rosario Santana. Consecuentemente, se elimina la partida concedida por daños y angustias mentales, fijada en $40,000.00. Así modificada, se confirma.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[27] *Pérez Rodríguez v. López Rodríguez et al.*, supra; *Nieves Huertas et al. v. ELA I*, supra; *Marrero Rosado v. Marrero Rosado*, supra, citando a *Elba A.B.M. v. U.P.R.*, supra.